**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN**

Case: 2:21-cr-20650
Judge: Michelson, Laurie J.
MJ: Grey, Jonathan J.C.
Filed: 10-20-2021 At 02:15 PM
INDI USA VS. SEALED MATTER (DP)

**UNITED STATES OF AMERICA,**

**v.**

**VIOLATIONS:**

**D-1 JOHN F. KENNEDY,**            18 U.S.C. § 371—Conspiracy
**D-2 DANIEL S. VICKERS,**          18 U.S.C. § 666(a)(1)(B)—Bribery

               **Defendants.**
_____/

## INDICTMENT

The grand jury charges:

## GENERAL ALLEGATIONS

At all times relevant to this indictment:

1.      Defendant **JOHN F. KENNEDY** was a sworn police officer for the City of Detroit ("City"), Michigan. From in or about August 2016 through in or about March 2018, **KENNEDY** was the supervisor in command of the Detroit Police Department's Integrity Unit, a component of the department's Internal Affairs Division, which was charged with investigating misconduct of City employees. Since March 5, 2018, **KENNEDY** has been assigned to the City's seventh precinct as a lieutenant in charge of the afternoon shift.

2.      Defendant **DANIEL S. VICKERS** was a sworn police officer for the City assigned to the Traffic Enforcement Unit.

3.     Both **KENNEDY** and **VICKERS** were agents of the City, in that they were employed as sworn officers of the Detroit Police Department ("DPD").

4.     The City was a local government entity that received federal assistance in excess of $10,000 in each of the calendar years 2016 through 2021.

5.     The City's towing procedures are set by a local ordinance which establishes standards for towing companies authorized to tow vehicles for the City ("Ordinance"). The regulations, as established by the Board of Police Commissioners, provide that tow companies must meet insurance and bonding requirements to qualify for police-authorized tows. DPD is required to maintain a current list of such qualified tow companies.

6.     The Ordinance also mandates that the Board of Police Commissioners promulgate administrative rules to determine which tow companies shall be notified about tows, and to ensure, "as nearly as practicable, for equitable distribution of police authorized towing to all towers on the list of qualified towers." In order to comply with the Ordinance, the City established a list of approved towing companies. When a tow is needed, companies on the list are selected on a rotating basis ("DPD policy").

7.     According to DPD policy, when an officer finds an abandoned car, the officer is required to contact DPD zone dispatch to provide the location, license plate number and/or Vehicle Identification Number ("VIN") of the car. The dispatcher

2

then advises the officer of the next available approved towing company in the rotation. The officer is required to contact the designated towing company, which then tows the car to its lot for storage.

8.      Towing companies charge a daily storage fee until a car is reclaimed by the owner or an insurance company. These fees can sometimes far exceed the value of the car itself. In addition, towing companies can sell unclaimed vehicles at auctions, which further increases the towing company's profit margin. Police officers and towing companies that violate the ordinance and DPD policy by circumventing the City's towing procedures put those approved towing companies that adhere to the City's policy at a significant disadvantage.

## COUNT ONE

(18 U.S.C. §§ 371 & 666(a)(1)(B) – Conspiracy to Accept Bribes)

**D-1 JOHN F. KENNEDY**
**D-2 DANIEL S. VICKERS**

9.      Paragraphs 1 through 8 of the General Allegations are hereby re-alleged and incorporated by reference here.

10.      From in or about May 2017 through in or about December 2018, DPD's Integrity Unit investigated allegations of wrongdoing committed by an individual involved in the towing industry ("Tower A").

11.      From in or about May 2017 through in or about March 2018, **JOHN F. KENNEDY** supervised DPD's investigation of Tower A's company.

12.     From in or about May 2017 through in or about September 2021, in the Eastern District of Michigan, Southern Division, and elsewhere, defendants **JOHN F. KENNEDY** and **DANIEL S. VICKERS** did unlawfully and knowingly conspire and agree with each other and with others, known and unknown to the grand jury, to commit an offense against the United States, that is, corruptly to solicit and demand for the benefit of any person, and to accept and agree to accept, things of value, including cash, cars, car parts, car repair services and other items from Tower A with the intent to be influenced and rewarded in connection with a business, transaction, or series of transactions of the City of Detroit, Michigan, involving $5,000 or more, in violation of Title 18, United States Code, Section 666(a).

### MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

13.     It was part of the conspiracy that **KENNEDY** and **VICKERS** solicited and accepted thousands of dollars in cash, cars, car parts, car repairs, and other items of value in exchange for directly referring to Tower A cars requiring towing services in the City, in violation of the Ordinance and DPD policy.

14.     It was further part of the conspiracy that **KENNEDY** and **VICKERS** solicited and accepted thousands of dollars in cash, cars, car parts, car repairs, and other items of value from Tower A in exchange for **KENNEDY** using and promising to use his influence as a supervisor to persuade other sworn officers to make tow referrals to Tower A's company, in violation of the Ordinance and DPD policy.

4

15.     It was further part of the conspiracy that **KENNEDY** and **VICKERS** solicited and accepted thousands of dollars in cash, cars, car parts, car repairs, and other items of value in exchange for providing Tower A with proprietary information about the status of DPD's Integrity Unit's investigation into Tower A's company.

## OVERT ACTS

In furtherance of the unlawful conspiracy, and to effect its objectives, the defendants and their co-conspirators committed the following overt acts, among others, in the Eastern District of Michigan:

16.     In or about March 2016, **VICKERS** asked Tower A to give him $1,200 in cash. In exchange, **VICKERS** offered to send tow referrals to Tower A. Tower A gave the cash to **VICKERS** but declined **VICKERS'** offer of tow referrals. **VICKERS** never repaid Tower A the $1,200.

17.     In or about May of 2017, Tower A made a $280.00 repair to the rear window of **KENNEDY's** wife's car. When **KENNEDY** received the invoice for the repair, **KENNEDY** claimed he did not know the cost "was going to be that much." After Tower A told **KENNEDY** he did not have to pay for the repair, **KENNEDY** responded, "I'll take care of you guys and make sure you guys are always under the radar."

18.     On June 19, 2017, **KENNEDY** sent a text message to Tower A: "Maybe if you have free time tomorrow so I can get a look at the car, just let me

know." On September 25, 2017, **VICKERS** asked Tower A to provide a BMW

sport utility vehicle to **KENNEDY**. After seeing a picture of the BMW,

**VICKERS** told Tower A that he wanted the BMW for himself instead.

19. On September 25, 2017, Tower A asked **VICKERS** about

**KENNEDY's** assurance that he would "look out for" Tower A. In response,

**VICKERS** told Tower A that **VICKERS** was **KENNEDY's** "go-between," and

that **KENNEDY** would have told **VICKERS** if Tower A had any problems with

the police department.

20. On or about November 16, 2017, after **VICKERS** reassured Tower A

that he did not have to worry about DPD's Integrity Unit's investigation into

Tower A's company, Tower A informed **VICKERS** that he would be giving

**VICKERS** and **KENNEDY** free cars:

> **Tower A**: Yeah, if I know I'm good, if I know I'm good, I'm gonna
> line them up. I got two, two for [**KENNEDY's**] kids and the one
> for you. He's got a Chrysler 200, the Fusion, and the Beamer.
>                           ***
>
> **DV**; [**KENNEDY**] told—
>
> **Tower A**: Tell [**KENNEDY**] I'm worried—
>
> **DV**: [**KENNEDY**] talks so clearly and freely like he know everything.
> 'That's my man, he good.' [**KENNEDY**] said, 'I'm just waiting
> on this shit to die down. I'm gonna get back with him and they
> told us every, you know, no investigations or nothing.' So I'm
> like, 'okay.'… That's what [**KENNEDY**] told me.
>
> **Tower A**: Alright, I love it. I love it.

DV: That's exactly what [**KENNEDY**] said.

Tower A: Alright. Marinate it. Verify it.

***

DV: I'll ask [**KENNEDY**] again.

Tower A: Let it marinate. Verify it and we rock and roll with it.

DV: ...[A]s soon as I walk up to [**KENNEDY**], he'll be like, 'Yeah, he alright, he alright.'

Tower A: [**KENNEDY**] knows what you're gonna ask?

DV: [**KENNEDY**] know what I'm gonna ask him.

21.    On December 21, 2017, after Tower A asked **VICKERS** to "double check" with **KENNEDY** about the status of DPD's Integrity Unit's investigation into Tower A's company, the following exchange occurred:

DV: I just talked to [**KENNEDY**] yesterday. That's what I—

Tower A: And?...

DV: Like I said, you might gonna catch it in hell getting the contract, but other than that, you good.

Tower A: Alright, my man, my man. I'll see you tomorrow then. We'll get—

DV: Mm-hmmm.

Tower A: -- I'll get you taken care of. You got it. Bye.

DV: Mm-hmmm.

22.     On January 11, 2018, **VICKERS** reassured Tower A that, "[he] ain't got no problems."

23.     On February 1, 2018, **VICKERS** accepted a $1,500 cash bribe from Tower A. After receiving the money, **VICKERS** told Tower A that he receives $200.00 in cash from another towing company in exchange for every tow referral **VICKERS** provides.

24.     On March 1, 2018, after **VICKERS** told Tower A that **KENNEDY** was being transferred out of DPD's Internal Affairs Division's Integrity Unit and **KENNEDY** wanted to obtain a car from Tower A before he left the division, **VICKERS** engaged in the following conversation with Tower A:

> **Tower A:** Hey, **KENNEDY** ain't workin' there [the Integrity Unit] no more, we can go to lunch now.
>
> **DV:**   Yeah, and he also want, he also looking for that now.  That car.
>
> **Tower A:**  Oh the car?  I'll... I got it.  I got... I got him covered.  It's done deal.

25.     On March 1, 2018, **VICKERS** solicited Tower A to provide carpeting for **VICKERS'** home in exchange for helping Tower A's towing business:

> **DV:**   I really want to get on this carpet thing, because my... even my wife's f***ing with me a little bit about that (UI)...
>
> **Tower A:** Oh, the carpet?  No, no, no.  I... I'm gonna get the carpet handled right now.  I'll get it handled.  I-I'm texting, I just texted the guy.  What's his address, to, to your place?  What I'm gonna have you do is, I'm gonna have you go to his place.  You don't gotta talk to no one, or whatever, just pick out the carpet you

want, take a picture of it, and then I'll handle it from there. You know how many square footage and all that you need…

26.     On March 4, 2018, Tower A and **VICKERS** arranged for the installation of new carpeting in **VICKERS'** home, and **VICKERS** confirmed he would help Tower A's towing business in exchange for the carpeting:

> **Tower A:** I will get handled this week I got busy on Friday dont forget me on accident tows and I got u coverd
>
> **DV:** U don't have to keep telling me that u r one the best people in my life that looks out for me I will do whatever I can to return the favor
>
> **DV:** That's why I call u GODFATHER.

27.     On March 16, 2018, **VICKERS** accepted a $1,200 cash bribe from Tower A to pay the contractor who installed new carpeting in **VICKERS'** home.

28.     On March 31, 2018, **KENNEDY** reminded Tower A that **KENNEDY** wanted another car: "[A]ny luck on a vehicle? Now I need a second car for my [family member] it just broke down."

29.     On or about May 28, 2018, **KENNEDY** and **VICKERS** had the following discussion regarding the investigation of Tower A and his desire for information as to the status of the investigation:

> **DV:** You know your boy wants me to talk to you.
>
> **JFK:** Who?
>
> **DV:** You know.

**JFK**: [Tower A]? About what?

**DV**: Oh man, he got an appointment with, damn I forgot the guy's name. He said you used to work with him. He's some kind of attorney general.

**JFK**: Oh, [attorney's name].

**DV**: Yeah, he got a meeting with him and he just needs you to give him the word if you could.

30. On or about May 28, 2018, **KENNEDY** and **VICKERS** agreed to meet at a DPD precinct to discuss the status of DPD's Integrity Unit's investigation into Tower A's company. That evening, **VICKERS** sent a text message to Tower A: "U should be good fair guy."

31. On June 8, 2018, Tower A paid **VICKERS** a $700.00 cash bribe, $200.00 of which Tower A mistakenly included in the bribe payment. The next day, **VICKERS** contacted Tower A, thanking Tower A for the additional $200.00 because **VICKERS** was "not expecting that."

32. On October 25, 2018, **KENNEDY** and Tower A discussed Tower A providing **KENNEDY** a free car in exchange for tow referrals:

**JFK:** Is um, uh, do you know about how much this is gonna cost me?

**Tower A:** Mm, not for this guy, I told you it was gonna cost nothing.

**JFK:** Oh, my man! Ok, well God bless.

\*\*\*

**Tower A:** And then when your, when your guy's like, 'you know… take care of me a little bit on the towing.'  If your guys you

10

got... see a car in the 7th Precinct, have your guys call me or
something.

**JFK:** Ok, we'll, we'll definitely can work that out.

33.    On October 25, 2018, **KENNEDY** accepted a used 2016 Ford Escape
from Tower A. The car was valued at $5,600, and required $1,625 in repairs, all of
which Tower A provided **KENNEDY** as a bribe. In exchange, **KENNEDY**
promised to direct towing business to Tower A in violation of the Ordinance and
DPD policy.

34.    On November 21, 2018, **KENNEDY** sent Tower A a text message with
information about the location of a stolen car: "9000 e Jefferson inside the parking
structure white dodge challenger." Later that day, a stolen, white Dodge Challenger
was recovered from this location.

35.    On January 3, 2019, **KENNEDY** sent Tower A a text message with
information about the location of a stolen car: "[i]n the area of St. Paul and
Belvedere, the King homes is where 90% of our stolen cares end up."

36.    On July 19, 2019, after Tower A confronted **KENNEDY** about having
been recorded by **KENNEDY, KENNEDY** responded by reminding Tower A that
**KENNEDY** was trying to help Tower A get towing business, and he was purposely
keeping their conversations vague:

**Tower A:** Yeah, I'm just saying, you said you got my back, you said
'I got you covered, I got you covered,' then I listen to this, I...

11

**JFK:** Yeah,

**Tower A:** I start scratching my head.

**JFK:** Yeah, the… no because it still had, you know, eve… our conversations… I always tried to keep our conversations vague because I don't want anything to come back on either one of us.

**Tower A:** Yeah, no.  I hope not.

\* \* \*

**Tower A:** Uh, I was just, I was thinking they got you working under cover right now at the 7th Precinct or something.

**JFK:** No, I'm too busy trying to get you cars, remember?

**Tower A:** What did…

**JFK:** I was too busy trying to get you… I was too busy trying to get you locations to where cars was.

\* \* \*

37.    In December 2019, **KENNEDY** asked Tower A to tow a family member's uninsured vehicle that had been impounded by a suburban police department from the impound lot and store it at his business. **KENNEDY** also told Tower A that he wanted to obtain insurance for vehicle before he filed a claim with the insurance company.

38.    On December 10, 2019, **KENNEDY** accepted a $5,000 cash bribe from an undercover federal agent to cover the tow bill and repairs to the family member's vehicle.

39.    On March 9, 2021, **KENNEDY** asked Tower A to provide repairs to the Ford Escape that **KENNEDY** had accepted from Tower A as a bribe on October 25, 2018. On March 11, 2021, after having paid for the repairs, **KENNEDY** accepted a $2,500 cash bribe from an undercover federal agent—$2,050 to cover the repairs to the Ford Escape and an additional $450.00 in a cash bribe. After receiving the bribe, **KENNEDY** assured the undercover agent that he would direct DPD officers to assist Tower A's business by referring towing business to Tower A, in violation of the Ordinance and DPD policy.

40.    On or about July 29, 2021, **KENNEDY** asked Tower A if he had any used cars available in his lot.

41.    On or about September 9, 2021, **KENNEDY** asked Tower A if he had any cars available: "I only need one car instead of 2."

All in violation of Title 18, United States Code, Sections 371 and 666(a)(1)(B).

## COUNT TWO

(18 U.S.C. § 666(a)(1)(B) – Acceptance of Bribes)

**D-2  DANIEL S. VICKERS**

1.    Paragraphs 1 through 8 of the General Allegations are re-alleged and incorporated by reference here.

2.     On or about February 1, 2018, in the Eastern District of Michigan, Southern Division, defendant **DANIEL S. VICKERS** corruptly solicited, demanded, accepted, and agreed to accept $1,500 in cash from Tower A, with the intent to be influenced and rewarded in connection with a business, transaction, or series of transactions of the City of Detroit, Michigan involving $5,000 or more.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT THREE

(18 U.S.C. § 666(a)(1)(B) – Acceptance of Bribes)

**D-2   DANIEL S. VICKERS**

1.     Paragraphs 1 through 8 of the General Allegations are re-alleged and incorporated by reference here.

2.     On or about March 16, 2018, in the Eastern District of Michigan, Southern Division, defendant **DANIEL S. VICKERS** corruptly solicited, demanded, accepted, and agreed to accept $1,200 in cash from Tower A, with the intent to be influenced and rewarded in connection with a business, transaction, or series of transactions of the City of Detroit, Michigan involving $5,000 or more.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT FOUR

(18 U.S.C. § 666(a)(1)(B) – Acceptance of Bribes)

**D-2   DANIEL S. VICKERS**

1.     Paragraphs 1 through 8 of the General Allegations are re-alleged and incorporated by reference here.

2.     On or about June 8, 2018, in the Eastern District of Michigan, Southern Division, defendant **DANIEL S. VICKERS** corruptly solicited, demanded, accepted, and agreed to accept $700 in cash from Tower A, with the intent to be influenced and rewarded in connection with a business, transaction, or series of transactions of the City of Detroit, Michigan involving $5,000 or more.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT FIVE

(18 U.S.C. § 666(a)(1)(B) – Acceptance of Bribes)

**D-1   JOHN F. KENNEDY**

1.     Paragraphs 1 through 8 of the General Allegations are re-alleged and incorporated by reference here.

2.     On or about October 25, 2018, in the Eastern District of Michigan, Southern Division, defendant **JOHN F. KENNEDY** corruptly solicited, demanded, accepted, and agreed to accept a car valued at $5,600 and car repairs valued at $1,625 from Tower A, with the intent to be influenced and rewarded in

15

connection with a business, transaction, or series of transactions of the City of

Detroit, Michigan involving $5,000 or more.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT SIX

### (18 U.S.C. § 666(a)(1)(B) – Acceptance of Bribes)

**D-1   JOHN F. KENNEDY**

1.     Paragraphs 1 through 8 of the General Allegations are re-alleged and

incorporated by reference here.

2.     On or about December 10, 2019, in the Eastern District of Michigan,

Southern Division, defendant **JOHN F. KENNEDY** corruptly solicited,

demanded, accepted, and agreed to accept $5,000 in cash from an undercover

federal agent, with the intent to be influenced and rewarded in connection with a

business, transaction, or series of transactions of the City of Detroit, Michigan

involving $5,000 or more.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT SEVEN

### (18 U.S.C. § 666(a)(1)(B) – Acceptance of Bribes)

**D-1   JOHN F. KENNEDY**

1.  Paragraphs 1 through 8 of the General Allegations are re-

alleged and incorporated by reference here.

2.  On or about March 11, 2021, in the Eastern District of Michigan, Southern Division, defendant **JOHN F. KENNEDY** corruptly solicited, demanded, accepted, and agreed to accept $2,500 in cash from an undercover federal agent, with the intent to be influenced and rewarded in connection with a business, transaction, or series of transactions of the City of Detroit, Michigan involving $5,000 or more.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## FORFEITURE ALLEGATIONS

(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(3))

The allegations contained in Counts One through Seven of this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a)(3).

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of a conspiracy to violate section 666(a), in violation of 18 U.S.C. § 371, the defendants, **JOHN F. KENNEDY** and **DANIEL S. VICKERS**, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to that violation.

Pursuant to 18 U.S.C. § 982(a)(3), upon conviction of the offenses set forth in Counts Two through Seven of this Indictment, the defendants, **JOHN F.**

**KENNEDY** and **DANIEL S. VICKERS**, shall forfeit to the United States of America any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such violations.

As part of the forfeiture in this case, the United States intends to seek a forfeiture money judgment.

If any of the property described above, as a result of any act or omission of the defendants:

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with, a third party;

     c.    has been placed beyond the jurisdiction of the court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeit substitute property pursuant

to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C.

§ 2461(c).

**THIS IS A TRUE BILL.**

*s/Grand Jury Foreperson*
Grand Jury Foreperson

SAIMA S. MOHSIN
Acting United States Attorney

*s/David A. Gardey*
DAVID A. GARDEY
Assistant United States Attorney
Chief, Public Corruption Unit

*s/Eaton P. Brown*
EATON P. BROWN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3220
phone:  313-226-9184
email: eaton.brown@usdoj.gov

*s/Dawn N. Ison*
DAWN N. ISON
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3220
phone:  313-226-9567
email: dawn.ison@usdoj.gov

Dated:  October 20, 2021

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned:** |
| ☐ Yes    ☒ No | **AUSA's Initials:**    *epb* |

**Case Title:** USA v.  <u>John F. Kennedy and Daniel S. Vickers</u>

**County where offense occurred :**  <u>Wayne</u>

**Check One:**    ☒ **Felony**        ☐ **Misdemeanor**        ☐ **Petty**

    <u>✓</u>Indictment/____Information --- **no** prior complaint.
    ____Indictment/____Information --- based upon prior complaint [Case number:        ]
    ____Indictment/____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____    **Judge:** _____

  ☐ Corrects errors; no additional charges or defendants.
  ☐ Involves, for plea purposes, different charges or adds counts.
  ☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

<u>October 20, 2021</u>
Date

*[signature]*

EATON P. BROWN
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: 313-226-9184

E-Mail address: eaton.brown@usdoj.gov

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.