United States District Court
Eastern District of Michigan

United States of America,

v.

D-1 John F. Kennedy,

Defendant.

_____/

Hon. Laurie J. Michelson

Case No. 21-20650

## Government's Sentencing Memorandum

For two years, defendant John Kennedy supervised the investigation of employee misconduct allegations for the Internal Affairs Department (IA) of the Detroit Police Department (DPD). Ironically, during that same period, Kennedy was perpetrating the exact type of fraud he was charged with eliminating. By soliciting bribe payments from a local towing company, Kennedy made a mockery of the self-policing arm of DPD, betrayed the public's trust, and lined his pockets with ill-gotten gains. The defendant's deceit and dishonesty must be punished. The government requests a sentence of 46 months to, among other things, reflect the seriousness of the offense, provide just punishment, and to afford adequate deterrence to the defendant and others who are tempted to betray the public's trust in this manner.

1

I.  **Factual & Procedural History**

A. <u>Kennedy's Work as a Detroit Police Officer</u>

Kennedy joined DPD in 1993 at the age of 28. (PSR ¶ 80). He worked a variety of assignments within the department before eventually reaching the rank of lieutenant. In 2016, DPD promoted Kennedy to supervisor in command of DPD's Integrity Unit, a component of the department's Internal Affairs Division. In this role, Kennedy was charged with investigating misconduct allegations against city employees.

Kennedy also worked closely with his childhood friend and co-defendant, Daniel Vickers, a Detroit Police officer who spent his career with the traffic enforcement unit making traffic stops, issuing warnings or citations, investigating crashes, and investigating stolen or abandoned vehicles. Vickers had relationships with local towing agencies who would assist in the removal of cars from the city's streets.

B. <u>City of Detroit Towing Procedures</u>

Detroit's towing procedures are set by local ordinance. The regulation requires that the board of police commissioners establish standards (e.g., insurance and bonding requirements), that must be met

in order for a tower to qualify for police authorized tows. Under this regulation, the police department is required to maintain a list of qualified towers. The approved tow companies must charge a set fee—part of which is paid to the tow company, a portion of which is paid to the City of Detroit, and some of which is charged to the car owner.

Abandoned vehicle officers and precinct patrol officers patrol the neighborhoods looking for abandoned cars. When an officer finds an abandoned car, the officer is supposed to call police dispatch and provide the location and the license plate or VIN of the car so that dispatch can notify the next tow company on the approved tow list. This procedure is meant to insure fairness amongst the towing companies within the city.

C. <u>Kennedy and Vickers Cheat the System</u>

Rather than adhere to the system in place however, Vickers violated the city's towing policy by making direct contact with towing companies which were not approved by the city to provide towing services. In exchange, the unapproved towing operators paid Vickers bribes in cash and other goods and services for the referrals. Vickers shared these relationships and access to illicit bribes payments with Kennedy.

D. <u>Detroit Police Department's Internal Affairs Division Investigates Tower A</u>

One of those towing companies was Tower A. In the spring of 2017, Tower A learned that he was under investigation by Kennedy and DPD's IA for paying cash to citizens for tips about the location of stolen cars.

E. <u>Kennedy Solicits Free Car Repairs From Tower A</u>

In May 2017, Kennedy told Tower A that a window was smashed in his Chevy Tahoe in a racially motivated incident. Tower A repaired the damage and did not charge Kennedy for the new glass. Kennedy did not offer to pay for this repair. A few weeks later, Kennedy brought his wife's Subaru to Tower A. This car also had a broken window which Tower A fixed. When Tower A's relative showed Kennedy the $280 bill for the work, Kennedy "freaked out" and said he "didn't think it was going to be that much." Tower A's relative told Kennedy he did not have to pay for the repair. In response, Kennedy reassured Tower A about the Internal Affairs investigation into Tower A's business: "I'll take care of you guys and make sure you guys are always under the radar."

F. <u>Vickers and Kennedy Solicit Bribes From Tower A</u>

In June of 2017, Kennedy and another Detroit police officer arrived at Tower A's tow yard to "shop" for new cars. Kennedy requested two used

4

cars in the $3,000 range for his children. Tower A informed the officers that he would have to check with his lawyer before he sold them anything. A few weeks later, Vickers called Tower A and reminded him that Kennedy still wanted the cars for his daughters.

In September 2017, Tower A and Vickers traded text messages in which Vickers told Tower A that he would be the go-between for Kennedy and Tower A regarding the IA investigation. In exchange for information on the investigation, Kennedy wanted a BMW SUV (a picture of which Vickers attached to the message). Vickers also told Tower A that Kennedy would look out for Tower A as IA's investigation progressed.

On October 31, 2017, Vickers showed up unannounced at Tower A's business. Vickers said that Kennedy was still interested in getting a car from Tower A. Vickers also reminded Tower A that Vickers wanted a BMW truck from Tower A, and that he needed a new battery for his current car. Tower A gave the battery to Vickers who did not pay for it.

On November 16, 2017, Tower A met with Vickers. Vickers told Tower A that Kennedy said Tower A was no longer under investigation by DPD. Vickers informed Tower A that the quid pro quo for this information was the cars that Kennedy and Vickers requested from

5

Tower A:

- **Vickers**: That's all I'm worried about.

- **Tower A**: I got, I got it… the car situation's handled. I'm gonna get y-you, i-it's a two…

- **Vickers**: I ain't worried about it. I know (UI)…
]
- **Tower A**: Yeah, yeah, if I know I'm good… if I know I'm good [*i.e., if I know I'm not under investigation*], I'm gonna line 'em up. I got two cars. I got two for [Kennedy's] kids, and one for you. He got a Chrysler 200, the Fusion, and a [BMW].

On December 15, 2017, Vickers called Tower A and confirmed that IA had closed the investigation into Tower A. One week later, Vickers called Tower A and reiterated his request for the BMW sport-utility vehicle in Tower A's lot.

On January 16, 2018, Vickers came to Tower A's business to assure him once again that Tower A was not under investigation by DPD. In a recorded conversation a few days later, Tower A thanked Vickers for the information about IA's investigation. Vickers then renewed his offer to continue to pass along confidential departmental information to Tower A in exchange for a vehicle or other benefit. Vickers also asked Tower A to tow his truck to Tower A's repair facility and perform repairs on it.

6

Vickers never paid or attempted to pay for these repairs.

On March 1, 2018, Vickers asked Tower A to buy new carpeting for Vickers' home. Vickers also told Tower A that Kennedy was getting transferred out of IA and wanted a car from Tower A before he left the division.

- **Vickers**: I really want to get on this carpet thing, because my... even my wife's fucking with me a little bit about that (UI)...

- **Tower A**: Oh, the carpet?  No, no, no.  I... I'm gonna get the carpet handled right now.  I'll get it handled.  I-I'm texting, I just texted the guy, what's his address to, to your place, what I'm gonna have you do is, I'm gonna have you go to his place.  You don't gotta talk to no one, or whatever, just pick out the carpet, pick out the carpet you want, take a picture of it, and then I, then I'll handle it from there.  You know how many square footage and all that you need...

- **Vickers**: Hey, Kennedy ain't working there no more, we can go to lunch now.  [*i.e., since Kennedy is no longer at Internal Affairs, and under scrutiny of the police department, Kennedy would be free to meet Tower A and Vickers*].
    **

- **Vickers**: Yeah, and he also want, he also looking for that now.  That car.

- **Tower A**: Oh the car?  I'll... I got it.  I got... I got him covered.  It's done deal.

7

- **Vickers**: Ok.

- **Tower A**: Alright?  You got it.  My man.  Thank you.

On March 16, 2018, Tower A drove to Vickers' house and paid him $1,200 for the new carpet.

On May 28, 2018, Vickers called Kennedy. During a recorded call, they discussed Tower A's pending legal matters that Tower A had asked both Kennedy and Vickers to check on for him. Later that day, Vickers and Kennedy met at one of the police precincts to discuss Tower A's case. After the meeting, Vickers texted Tower A, "U should be good fair guy."

On June 8, 2018, Tower A called Vickers and told him he had "five" ($500) for Vickers. When Vickers arrived at Tower A's business, Tower A showed Vickers some car invoices and asked what Kennedy could do for him now that Kennedy was moved out of IA and back to the precinct. Vickers told Tower A that Kennedy would throw Tower A some tows here and there. Two months later, Kennedy sent a text message to Tower A with a picture of a set of wheels and tires he wanted for his son's car.

On October 25, 2018, Tower A transferred a car to Kennedy as part of a controlled bribe. Kennedy received the car for free and, in

8

exchange, agreed to direct towing business to Tower A's company outside of the department's towing regulation (since Tower A's towing permit was still suspended). Tower A then told Kennedy that he had purchased the car Kennedy wanted for $5,600 and was transferring the title through another person so that people would not connect Kennedy to Tower A. The total amount of the bribe paid to Kennedy by Tower A was $7,225 ($5,600 for used car, $1,625 in repairs).

On July 19, 2019, Tower A called Kennedy after Tower A learned that Kennedy had recorded one of their conversations. Kennedy lied and denied being the one to record the call but reassured Tower A that he still had Tower A's back and was trying to get Tower A more cars to tow:

- **Kennedy**: What's up?

- **Tower A**: Nothing... you said you got my back, you gonna keep me under the radar. Everything good. And then I'm going through this thing with my lawyer and I got a recording of me and you…

\*\*

- **Tower A**: I mean it, it, it, it's old, but I just hope you ain't heh, I ain't getting set up on all this shit. I'm trying to help you out.

- **Kennedy**: No, you ain't getting up, you didn't get set up on anything, man. I, I but... that's, that's not, that's not in me. I, I didn't set you up on nothing.

9

\*\*
- **Tower A**: The first day I met you, I... the first day I met you I been looking out for you. I was like...

- **Kennedy**: You were, huh...

- **Tower A**: That was around that time that I did that glass... The glass for you on your truck.

- **Kennedy**: Yeah, (UI).

- **Tower A**: Wasn't it around that same time?

- **Kennedy**: No, unh uh. No. This was, this was, a... this was after you had your license taken from the city (*in June of 2017*).

- **Tower A**: Oh, ok, well...

- **Kennedy**: That was after you had your license taken from the city. This...

- **Tower A**: Yeah, I'm just saying, you said you got my back, you said "I got you covered, I got you covered," then I listen to this, I...

- **Kennedy**: Yeah, the... no because it still had, you know, eve... our conversations... I always tried to keep our conversations vague because I don't want anything to come back on either one of us.

- **Tower A**: Yeah, no. I hope not.

- **Kennedy**: So, the conversation, it was completely vague when it comes to, we talking about the towing and all that other stuff.

- **Tower A**: Yeah.

10

**\*\***

- **Tower A**: Is there anything else I need to know about? I mean, I, w...

- **Kennedy**: No, no

- 
- **Tower A**: We don't...

- **Kennedy**: No.

- **Tower A**: When I, when I gave you the, the other car, or anything like that? No, nothing?

- **Kennedy**: No.

- **Tower A**: That would be bad.

- **Kennedy**: I was already gone by that time.

- **Tower A**: Uh, I was just, I was thinking they got you working undercover right now at the, at the 7th Precinct or something.

- **Kennedy**: No, I'm too busy trying to get you cars, remember?

- **Tower A**: What did...

- **Kennedy**: I was too busy trying to get you... I was too busy trying to get you locations to where cars was.

- **Tower A**: Yeah, yeah, yeah.

- **Kennedy**: So there's no, there's no way I was doing that, 'cause (UI) you the one actually told me you can't get cars from private property.

- **Tower A**: Yeah.

11

- **Kennedy**: 'Cause I was still trying to get you places to tow cars from.

\*\*

- **Kennedy**: I been, I been trying to... Ev... Every kind of way that I can try to help you out, I'll try it.

\*\*

On December 10, 2019, Tower A placed a consensually recorded call to Kennedy and set up a meeting between an FBI undercover and Kennedy. The undercover then paid Kennedy a $5,000 cash bribe for car repairs plus $225 for the tow.

On March 9, 2021, Kennedy called Tower A and told him he was having trouble with his car. Tower A had Kennedy's car towed to his family's repair facility and did not charge Kennedy for the tow. The car needed a new transmission and the repair bill was $2,050. Tower A told Kennedy to put the repair on a credit card for now and Tower A would bring him the cash to cover it later. Tower A told Kennedy to send him towing business in return.

On March 11, 2021, Tower A called Kennedy and told him that he was too busy to meet to bring him the money and was sending someone (the FBI undercover) with the cash. Kennedy assured Tower A that his police officers would work with Tower A on towing issues. Later that day,

12

the undercover met with Kennedy and paid him a $2,500 cash bribe.

In total, Kennedy accepted bribes amounting to $14,950 during the course of the conspiracy. Vickers accepted over $3,400 in bribe payments from the towing company.

G. <u>Kennedy Pleads Guilty</u>

On August 24, 2022, Kennedy pleaded guilty to conspiracy to accept bribes. Sentencing is scheduled for April 18, 2023.

## II. Guidelines

The probation department calculated a guideline range of 37 to 46 months in prison (21/I). The government agrees with the probation department's calculations and requests a sentence at the top of the guidelines.

## III. Argument

Title 18, United States Code, Section 3553 details a number of considerations for the Court to take into account when imposing sentence. For Kennedy, the most important are the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to promote adequate deterrence. 18 U.S.C. §§

3553(a)(1), (a)(2)(A), and (a)(2)(B). The sentence imposed by the Court should also consider avoiding sentencing disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6).

    A. <u>The Seriousness of Kennedy's Crimes, Promoting Respect for the Law, and Providing Just Punishment</u>.

There is no question that Kennedy's crimes are serious. The defendant used his position of influence and access to confidential information to extort towers and to collect bribes for his own benefit. Unfortunately, this kind of corruption does not just victimize the citizens of Detroit and the towing companies; its impact also unfairly brings disrepute on upstanding members of the law enforcement community. And these offenses serve only to erode the community's trust of the police force—an essential element of effective policing. For these crimes Kennedy should be punished. 18 U.S.C. § 3553(a)(2)(A).

Moreover, as a public official, particularly one in charge of investigating misconduct committed by city employees, Kennedy knew it was wrong to circumvent the towing procedures to solicit bribes from any member of the public. Ultimately, Kennedy placed his desire for personal enrichment ahead of the trust the Detroit Police Department and the citizens of Detroit placed in him to adhere to the highest standards of

14

integrity and professionalism. A sentence of 46 months reflects the seriousness of Kennedy's conduct while providing just punishment for his crimes.

B. <u>Affording Adequate Deterrence to Criminal Conduct.</u>

Specific deterrence is an important consideration in every case, however, given Kennedy's resignation from the police department and this felony, he will never serve in this capacity again. 18 U.S.C. § 3353(a)(2)(B). General deterrence is a more important consideration because other public officials may be tempted to engage in similar criminal conduct given the money and goods Vickers and Kennedy were able to extort from towing companies. Consequently, a significant custodial sentence will hopefully deter others who, like Kennedy, are tempted to fraudulently enrich themselves at the expense of the public's right to a law enforcement agency characterized by integrity and honesty.

C. <u>Avoiding Sentencing Disparities Among Similarly Situated Defendants</u>.

Section 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." That subsection "is concerned with national disparities among the many defendants with

15

similar criminal backgrounds convicted of similar criminal conduct." *United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010). A court's careful review of the guideline range "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Consideration of stiffer white-collar penalties applies particularly to public corruption cases. In November 2004, the Sentencing Commission amended the guidelines to increase the punishment for corrupt public officials. The Commission explained that "public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses," especially when compared with other white-collar crimes. USSG, App'x C, Vol. III, at 82 (Amendment 666). The Commission thus increased the base offense level for public officials, like Kennedy, because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." *Id*. While Kennedy was not an elected public official, he was a sworn police lieutenant charged with honestly administering the duties and responsibilities of a law enforcement

16

officer, and more specifically with investigating misconduct among his co-workers.

Kennedy's co-defendant, Vickers, recently received a 27-month sentence. But Kennedy's actions are distinguishable from Vickers'. Kennedy's abuse of his position within the Internal Affairs Department coupled with bribes amounting to over four times the amount Vickers received, has earned Kennedy 19 additional months' imprisonment.

## IV. Conclusion

The government requests a sentence of 46 months in prison.

Respectfully submitted,

Dawn N. Ison
United States Attorney

/s/Eaton P. Brown
Eaton P. Brown
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
Email: eaton.brown@usdoj.gov

Dated: April 12, 2023

## Certificate of Service

I hereby certify that on April 12, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

/s/Eaton P. Brown
Eaton P. Brown
Assistant United States Attorney